**CORPORACION INSULAR de SEGUROS, Plaintiff,**

v.

**Hon. Juan Antonio GARCIA, Defendant.**

Civ. No. 87–0431(RLA).

United States District Court, D. Puerto Rico.

March 15, 1989.

Jesús Rabell Méndez, Harry R. Nadal Arcelay, Cancio Nadal & Rivera, San Juan, P.R., Sheldon H. Nahmod, Chicago, Ill., for plaintiff.

Luis N. Blanco Matos, Pedro A. Del Valle, Federal Litigation Div., Dept. of Justice, San Juan, P.R., José Luis González Castañer, Kenneth Colón, Ramirez & Ramirez, Hato Rey, P.R., for defendant.

## OPINION AND ORDER

ACOSTA, District Judge.

Before the Court are several documents submitted under seal by three non-party deponents [1] for our in-camera inspection. which requested the following information:

---

1. These Government officials were served by plaintiff with subpoenae duces tecum all of

We must determine whether or not they are protected from disclosure by the Speech or Debate Clause (also known as the legislative privilege) or the executive privilege (often referred to as state secrets or the federal deliberative process privilege).

The intended deponents are: Mr. Oscar Rodríguez, an aide to the Governor of Puerto Rico, and Messrs. Juan B. Aponte and Jaime Platón,[2] aides to the President of the Senate of Puerto Rico (we will refer to all three as "petitioners"). All of them participated in the legislative consideration and eventual enactment of the now challenged Public Law No. 4.

Plaintiff, Corporación Insular de Seguros, a private insurance company with the largest local market-share of medical malpractice insurance underwriting, filed this 42 U.S.C. § 1983 action against the Puerto Rico Commissioner of Insurance asking this Court to declare Puerto Rico Act No. 4, of December 30, 1986, 26 L.P.R.A. §§ 4101 *et seq.* (Supp.1987) unconstitutional. Public Law No. 4 authorized the creation and operation of a medical malpractice insurance syndicate[3] to ensure that doctors, especially those considered "high risks," and

health institutions would have continued access to adequate insurance coverage.

Plaintiff alleges that Public Law No. 4 violates the taking, due process and equal protection clauses of—as well as the First Amendment to—the United States Constitution insofar as, e.g., Law No. 4 treats plaintiff dissimilarly from other similarly situated insurance companies and also that the law lacks a rational relationship between the so-called malpractice insurance crisis and the creation of SIMED.

Plaintiff argues that the information it seeks from these three individuals is essential to its prosecution of the present case because "... what transpired in these [legislative] meetings who met with whom and what did they say, [and] what documents were produced, regarding the enactment and implementation of the Syndicate...." [4] will help it (plaintiff) show that the legislative process was somehow substantively infirm. Also that the information will shed light on how the legislated birth of SIMED vis-à-vis plaintiff rests on grounds wholly irrelevant to the achievement of Puerto Rico's objective of providing affordable and

---

All documents regarding the medical malpractice crisis for the years 1984–1988, including all studies in your possession regarding said crisis (including previous years). All correspondence regarding the Syndicate with the Executive Branch, the Commissioner of Insurance, the Legislative Branch, and the insurance companies, doctors, hospitals, advisors, the Medical Association and the "Comité Coordinador de Médicos." All documents regarding the task forces appointed by the Governor and the President of the Senate to deal with the medical malpractice crisis. Include your Curriculum Vitae.

The officials immediately requested, and we eventually granted, a protective order that forbade the taking of any of the depositions until the Court could review the documents to determine their privileged status, if any. *See* Omnibus Order of September 14, 1988 (docket No. 122).

2. No documents were submitted for *in-camera* inspection on behalf of Mr. Platón, therefore we assume that he is not raising any privilege as to any of the documents requested by plaintiff and consequently that he has produced the same. However, for the reasons stated below, the protective order we issued previously regarding Mr. Platón's deposition will stand.

3. The entity created was the Joint Underwriting of Medico–Hospital Professional Liability Insurance (SIMED) and it was "part of the legislative response to a perceived crisis in the availability and affordability of medical malpractice coverage in Puerto Rico.... [T]he legislature, faced with a situation wherein a mere handful of insurers were willing to underwrite malpractice risks, attempted to stimulate the marketplace by establishing a syndicate which would actively compete for such business. The Syndicate (SIMED) was created on a 'compulsory participation' basis, that is, '[a]ll insurers in Puerto Rico licensed to contract any type of insurance ... shall be members of the Syndicate and their participation in it shall be an indispensable condition for them to continue underwriting insurance in the Commonwealth of Puerto Rico.'" *In re Insurers Syndicate for the Joint Underwriting of Medico–Hospital Professional Liability Insurance,* slip op. No. 88–1845; *Corporación Insular de Seguros v. Hon. Juan Antonio García, etc.,* slip op. No. 88–1905 (consolidated cases), 864 F.2d 208 (1st Cir.1988) First Circuit Court of Appeals (December 28, 1988) (citing 26 L.P.R.A. § 4104).

4. Plaintiff's memorandum at 4.

adequate medical malpractice insurance to some of its citizenry.

Petitioners' main objection to plaintiff's subpoenae duces tecum is that the information sought involves confidential governmental communications protected by one or another of the aforementioned privileges, i.e., legislative, executive or federal deliberative process.[5]

In our Omnibus Order filed September 14, 1988 (docket No. 122) we found that, contrary to petitioners' allegations, the information was relevant. Pursuant to Fed. R.Civ.P. 26(b) and Fed.R.Evid. 501, however, we determined that "the information sought *as presently characterized* falls within the Speech or Debate Clause and is therefore privileged against disclosure." (Order at 6) (emphasis added). We then decided that an inspection of the documents would help establish the particular need for any deposition. We thus limited our ruling to a prohibition of the taking of any immediate deposition of these parties until we had an opportunity to review, *in camera,* the disputed documents to determine their privileged status, if any. *Id.* at 6–7. *See Kerr v. United States District Court,* 426 U.S. 394, 406, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976) (*"in camera* review is a highly appropriate and useful means of dealing with claims of governmental privilege"). Therefore, the question left open was whether or not the documents should be protected and consequently whether or not any of the requested depositions could be taken.

We will begin our discussion with an exposition of the state of the law regarding the privileges asserted by petitioners and conclude with an application of that law to each of the documents submitted for inspection.

## DISCUSSION

### A. The Speech or Debate Clause Privilege

The federal legislative privilege emanates from the Speech or Debate Clause of the Constitution.[6] The Clause is designed to protect legislators against "possible prosecution by an unfriendly executive and conviction by a hostile judiciary." *United States v. Johnson,* 383 U.S. 169, 179, 86 S.Ct. 749, 754, 15 L.Ed.2d 681 (1966). This legislative privilege is rooted in the Framers' concern for an effective system of checks and balances among the three governmental branches. Such a system, it was felt, would avoid an American version of the parliamentary struggles typical of 17th Century England where monarchs would improperly bend the will of parliamentarians with threats and acts of criminal prosecution. *See generally United States v. Gillock,* 445 U.S. 360, 368–70, 100 S.Ct. 1185, 1191–92, 63 L.Ed.2d 454 (1980) (citing 8 The Works of Thomas Jefferson 322 (Ford ed. 1904); The Works of James Wilson 421 (R. McCloskey ed. 1967); *Lake Country Estates, Inc. v. Tahoe Reg. Plan.,* 440 U.S. 391, 403, 99 S.Ct. 1171, 1178, 59 L.Ed.2d 401 (1979); and *Tenney,* 341 U.S. at 372–75, 71 S.Ct. at 786–87). The purpose of the Speech or Debate Clause is thus to create an evidentiary privilege for congressmen that immunizes them "not only from the consequences of litigations' results but also from the burden of defending themselves." *Dombrowski v. Eastland,* 387 U.S. 82, 85, 87 S.Ct. 1425, 1427, 18 L.Ed.2d 577 (1967). The scope of the

---

5. Specifically, petitioners assert that "[t]he documents that plaintiff is requesting are part of the deliberative process by the legislature and executive branches to face difficult problems with respect to the availability and cost of Medico–Hospital Malpractice Insurance in Puerto Rico.... That is, the documents pertain to the consideration by the Executive Branch of different legislative alternatives to cope with the malpractice crisis." Petitioners' "Motion in Support of Privilege Claims," docket No. 131 at p. 4. Again, it is important to keep in mind that what is at stake here is not only the production of

those documents but any questions that may be made about them by way of depositions.

6. U.S. Const. Art. I § 6. "[F]or any Speech or Debate in either House, they [Senators and Representatives] shall not be questioned in any other Place." The Clause has counterparts in the vast majority of state constitutions, *see Tenney v. Brandhove,* 341 U.S. 367, 375 n. 5, 71 S.Ct. 783, 788 n. 5, 95 L.Ed. 1019 (1951). And also in the Puerto Rico Constitution. Art. III § 12 of the Constitution of the Commonwealth of Puerto Rico, 1 L.P.R.A. § 14 (Supp.1987).

Clause includes actual communications on the congressional floor and "... other matters that are an integral part of the deliberative and communicative processes by which members participate in committee and House proceedings...." *Hutchinson v. Proxmire*, 443 U.S. 111, 127, 99 S.Ct. 2675, 2684, 61 L.Ed.2d 411 (1979) (In a libel suit against a United States Senator the court held that the Senator's press releases and newsletters were not protected by the Speech or Debate Clause).[7] In other words, the privilege applies to evidence or testimony about all "acts that occur in the regular course of the legislative process." *U.S. v. Brewster*, 408 U.S. 501, 525, 92 S.Ct. 2531, 2544, 33 L.Ed.2d 507 (1972).[8]

The privilege applies equally in the criminal and civil contexts. *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 502–03, 95 S.Ct. 1813, 1821, 44 L.Ed.2d 324 (1975). This protection accorded members of Congress extends to all congressional aides and assistants, provided that the activity in question would be protected if performed by a congressman. *Gravel*, 408 U.S. at 616–18, 92 S.Ct. at 2622–23. In this context, aides are perceived as the alteregos of their superiors in recognition of the important role they play in the legislative decisionmaking process. This contribution entitles them to be free from prosecution for their official acts.

The basic rationales that undergird the Speech or Debate Clause are essentially two and they are symbiotic: (1) separation of powers, and (2) legislative independence. *Gillock*, 445 U.S. at 369, 100 S.Ct. at 1191. Other principles articulated by the Supreme Court all seem interrelated with the Clause's central purpose of "avoid[ing] intrusion by the Executive or Judiciary into the affairs of a coequal branch." *Gillock*, 445 US. at 369, 100 S.Ct. at 1191.[9] For example, the chill that a threat of criminal prosecution may have over legislators in the performance of their duties, *Gravel*, 408 U.S. at 617–18, 92 S.Ct. at 2623; the diversion of a legislator's official time, energy and attention to their legislative tasks, *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 503, 95 S.Ct. 1813, 1821, 44 L.Ed.2d 324 (1975); the potential harassment a simple "conclusion of the pleader" may effect over a legislator, *Tenney*, 341 U.S. at 377, 71 S.Ct. at 788; and, to a much lesser extent, the need to preserve the confidentiality[10] of official communications. This constitutional immunity embodies the public interest of ensuring that legislators be free from outside intrusion—either by a coequal branch of government or the public itself—so that they may perform their public tasks efficiently and properly.

In sum, federal legislators and their aides have an absolute[11] immunity from criminal or civil liability (for either injunctive relief or damages) for the purely legislative acts they perform.

█ An analysis of the privilege for members of Congress, as made clear

---

7. *See also Gravel v. United States*, 408 U.S. 606, 628–29, 92 S.Ct. 2614, 2629, 33 L.Ed.2d 583 (1972) (the legislative privilege does not protect sources of information used by legislators to help them reach legislature decisions if such sources are relevant to the prosecution or investigation of third-party crime).

8. The Third Circuit Court of Appeals has convincingly explained that the legislative acts language of *Brewster* is *not*, unlike other privileges, rooted in concerns of confidentiality because "[t]he speech or debate privilege is at its core a 'use privilege' not a privilege of nondisclosure." *In re Grand Jury*, 821 F.2d 946, 958 (3rd Cir. 1987) (citations omitted).

9. In the words of the Supreme Court, the central purpose of the Clause is "to preserve the constitutional structure of separate, coequal, and independent branches of government. The English and American history of the privilege suggests that any lesser standard would risk intrusion by the Executive and the Judiciary into the sphere of protected legislative activities." *United States v. Helstoski*, 442 U.S. 477, 491, 99 S.Ct. 2432, 2441, 61 L.Ed.2d 12 (1979).

10. *See* note 8 *supra* and note 15 and accompanying text *infra*.

11. By "absolute" we understand that, unlike other types of governmental immunity, legislative immunity cannot involve the application of a balancing test such that the interests of the government are played against the news interests of the public. *See Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 503, 95 S.Ct. 1813, 1821, 44 L.Ed.2d 324 (1975).

above, inevitably involves constitutional concerns. In contrast, an analysis of the privilege for state legislators involves only the federal common law of evidence.

Although the Clause by its terms applies only to members of Congress; federal common law, pursuant to Fed.R.Evid. 501, has long upheld the immunity of state legislators from *civil* liability based on general speech or debate clause rationales. *See generally United States v. Johnson,* 383 U.S. at 169, 180, 86 S.Ct. 749, 755 ("the state legislative privilege [in § 1983 suits is] on a parity with the similar federal privilege" under the Speech or Debate Clause); *Tenney v. Brandhove,* 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951) (state legislators enjoy immunity from civil suits brought by private litigants alleging constitutional torts under 42 U.S.C. § 1983); [12] *Martínez Acosta v. Hernández Agosto,* 590 F.Supp. 144 (D.C.P.R.1984) (Pieras, J.) (Secretary of Justice of Puerto Rico was properly subpoenaed to appear before Senate Nominations Committee and legislators were immune from § 1983 suit by virtue of the federal Speech or Debate Clause.)

The protection against civil liability includes suits for damages, and injunctive or declaratory relief. On this last, which impacts on the present case since it is one for declaratory judgment, we rely on the judicial concerns for legislative independence and absence of intrusion underscored by the Speech or Debate Clause jurisprudence. *See also Supreme Court of Virginia v. Consumers Union of the United States,* 446 U.S. 719, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980) (consumer organization brought civil rights suit against Virginia Supreme Court seeking a *declaration* that they had violated the First and Fourteenth Amendments by promulgating and enforcing rules prohibiting attorney advertising. The Virginia Supreme Court was held to be immune from suit). Similarly, we see no distinction regarding petitioners' third-party status since the intrusion rationales for the privilege remain constant, albeit they are more attenuated in third party actions than where government officials are being sued directly. *See Eastland,* 421 U.S. at 513–18, 95 S.Ct. at 1826–29.

*State* legislators, however, are not immune against federal *criminal* prosecutions. In *United States v. Gillock,* 445 U.S. 360, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980), the Supreme Court reversed the lower federal courts in the Sixth Circuit who had granted and upheld the suppression of certain evidence in a federal bribery trial against a Tennessee State Senator on the grounds that Rule 501, Fed.R.Evid., authorized a speech-or-debate type privilege for state legislators in federal criminal prosecutions. Resolving a conflict among circuits, the Supreme Court categorically held that state legislators enjoy no evidentiary privilege in federal criminal prosecutions. The Court apparently felt that this holding was not a retreat from the broad protection, rooted in a concern for the independence of state legislators, expressed in *Tenney* because "... this Court's decisions on immunity of state officials from suit have drawn the line at civil actions." *Gillock,* 445 U.S. at 361, 100 S.Ct. at 1187 (citing *Tenney, supra* and *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)).

**12.** Although the *Tenney* Court did not base its decision on the federal Speech or Debate Clause it did extensively discuss the policies underlying the Clause to support its holding. *Tenney* involved a suit for violation of civil rights by the Senate Fact–Finding Committee on Un–American Activities, a California legislative committee involved in the "red" scare following World War II. The court held that § 1983 did not create civil liability for the Committee's conduct. The court's opinion penned by Mr. Justice Frankfurter essentially recognized that the unique status of the legislative privilege, maintained for several centuries at common law and enshrined in the Federal Constitution as well as in all but seven of the States' Constitutions, required that absent evidence of explicit congressional intent to the contrary, state legislators maintain the protection they had long enjoyed especially when there remained power in the voters to "discourag[e] or correc[t]" abuses by their elected representatives. *Tenney,* 341 U.S. at 378, 71 S.Ct. at 789. *See also Lake Country Estates, Inc. v. Tahoe Reg. Plan,* 440 U.S. 391, 406, 99 S.Ct. 1171, 1179–1180, 59 L.Ed.2d 401 (1979) (extending the *Tenney* holding to include "regional legislators" such as land plannification boards.)

The Court noted that of the two rationales for the Speech or Debate Clause, i.e., separation of powers and legislative independence, only the second one applied to state legislators. This is so, the Court explained, because the Framer's concern for effective checks and balances between government branches did not overflow to the states since the Constitution provided for a federal judiciary of limited power, unlike the "unfettered authority which English monarchs exercised over the Parliament," and because the "Supremacy Clause dictates that federal enactments will prevail over competing state exercises of power." *Id.* at 370, 100 S.Ct. at 1192. Moreover, the Court dismissed arguments that principles of comity required that federal courts recognize a common-law privilege to protect state legislators in federal criminal prosecutions. In the words of the Court, "[w]here important federal interests are at stake, as in the enforcement of federal criminal statutes, principles of comity must yield. Recognition of an evidentiary privilege for state legislators for their legislative acts would impair the legitimate interest of the Federal Government in enforcing its criminal statutes with only speculative benefits to the state legislative process." *Id.*, 445 U.S. at 361, 100 S.Ct. at 1187.

As for the second rationale underlying the Speech or Debate Clause (legislative independence) the Supreme Court in *Gillock* expressed an implicit fear of immunizing institutional abuses when it stated that "the cases in this court which have recognized an immunity from civil suit for state officials have presumed the existence of federal criminal liability *as a restraining factor on the conduct of state officials.* *Id.* at 372, 100 S.Ct. at 1193 (Citations omitted and emphasis added.) Worded differently, the Court found that the supremacy of federal criminal statutes over state procedures was meant to ensure some form of legislative accountability. This does, however, seem to fly in the face of the Court's opinion in *Tenney* that legislators are watched by and accountable to their constituencies and that granting them a broad privilege would prevent the executive branch and private individuals only from unduly influencing the legislative process (to prevent handcuffing state legislators to, e.g., potential harassment by the simple conclusion of the complainant). *See Tenney*, 341 U.S. at 377–78, 71 S.Ct. at 789; *see also* note 12 *supra* and accompanying text. It seems thus that the Court felt that a mechanism for legislative accountability was already in place without the need for federal criminal liability as a restraining factor. Whatever our misgivings about the need for maintaining the threat of federal criminal liability against state legislators in order to ensure legislative accountability, we are, of course, bound by the Supreme Court's pronouncements, particularly on issues of federalism. Therefore we interpret the *Gillock* preclusion of a Rule 501 evidentiary privilege for state legislators in federal criminal proceedings as being absolute. *See In re Grand Jury*, 821 F.2d 946 (3rd Cir.1987) (The Court rejected the lower court's application of a *qualified* legislative immunity in a case where Pennsylvania legislators refused to comply with a federal grand jury subpoena seeking certain records of a committee's investigation into alleged contractual fraud.)

Of course, the present case involves a civil suit and not a criminal prosecution, but the above discussion is relevant insofar as it delineates the rationales supporting legislative immunity. It also defines the entire contours of the privilege in order to better understand when, how, and why state legislators are afforded federal common-law evidentiary protection.

In addition, *Gillock* exemplifies the Supreme Court's latest thinking on legislative privilege, a matter which it has otherwise "directly passed on ... relatively few times in 190 years." *Hutchinson v. Proxmire*, 443 U.S. at 124, 99 S.Ct. at 2683. Insofar as *Gillock* represents the Court's adamant refusal to extend the privilege to state legislators despite strong considerations of federalism it signifies a retreat from the original concern for the independence of state legislators expressed in *Tenney*, *supra*, and reinforces the conservative stance of the Court regarding privileges in gener-

al. *See e.g., Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976) (The justification for a privilege must be specific, for courts should apply privileges "only to the extent necessary to achieve their purpose.")

In the case at bar the civil legislative privilege comes into play because even though petitioners are not named defendants some of the issues regarding the privilege nonetheless exist because of petitioners' close relationship with the legislative process and the very nature of the documents requested. Some of these concerns are, for example, the threat of harassment by the federal judiciary (especially should we order disclosure and petitioners not comply); the dangers of distraction from public duties as well as the potential disruption of confidential communications. Therefore, should we find any of the documents submitted to come under the umbrella of the Clause, we shall accordingly order it protected from disclosure.

### B. *The Executive Privilege*

#### 1. State Secrets

■ The executive privilege protects the confidentiality of the deliberations of a wide range of government officials, including government agencies independent of the executive branch. The term "executive privilege" is somewhat problematic insofar as it has been used by the courts to denote not only the privilege shielding executive deliberations but also the privilege protecting military, diplomatic, and other national secrets. *See, e.g., United States v. Nixon*, 418 U.S. 683, 710–11, 94 S.Ct. 3090, 3109, 41 L.Ed.2d 1039 (1974). For our purposes, we find it helpful to distinguish between the "deliberative process privilege," which we will discuss in the next section of this Order, and the "states secrets privilege." *See, e.g., United States Department of Energy v. Brett*, 659 F.2d 154, 155 (Temp. Emer.Ct.App.1981); *In re "Agent Orange" Prod. Liab. Litig.*, 97 F.R.D. 427, 429–31 (E.D.N.Y.1983). The two types of privileges are similar insofar as they are rooted in concerns of national security and confidentiality. They differ, however, mostly in a doctrinal sense: the state secrets privilege does not protect communicative *processes*, as does its counterpart, but instead it protects factual *information*, regardless of whether any communications are involved. The obvious reason for this is that release of highly secret military or diplomatic information is a dangerous risk to the public or to the national government. *See United States v. Reynolds*, 345 U.S. 1, 7–11, 73 S.Ct. 528, 531–34, 97 L.Ed. 727 (1953).

In the present case, although the above distinction has not been made clear by the parties, we find that there is no support or call for a state secrets executive privilege and therefore will allow the release of any purely factual information that does not fall under the protection of the other privilege doctrines discussed in this Order.

#### 2. Deliberative Processes

The main justification for the deliberative process privilege has little to do with separation of powers, as opposed to the legislative privilege, and much to do with the public policy of protecting confidential exchanges of opinions and advice within the executive branch. *See Kaiser Aluminum & Chemical Corp. v. United States*, 141 Ct.Cl. 38, 157 F.Supp. 939 (1958). Thus, we are dealing here not with the constitutional foundations of the Speech or Debate Clause (to guard against excesses of executive prosecutorial authority) but with judicial protectionism, now well ensconced in federal common law, *see In re "Agent Orange" Prod. Liab. Litig.*, 97 F.R.D. at 434–36 (citing other cases), of executive officials from undue public exposure. Although some commentators are not convinced by this underlying reason insofar as it may exacerbate the lack of political accountability of executive officials or shroud official abuse in secrecy, there seems nonetheless to be a consensus that unlimited discovery of executive deliberations would tend to chill important governmental deliberative processes. *See generally* Project, *Developments in the Law —Privileged Communications*, 98 Harv.L. Rev. 1450, 1622 (1985).

**296**

■ The executive privilege is limited to the interchange of documents that reflect advisory opinions, recommendations and deliberations that actively contribute to the decisionmaking process. *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150, 95 S.Ct. 1504, 1516, 44 L.Ed.2d 29 (1975). Thus, factual statements or post-decisional documents explaining or justifying a decision are not protected by the privilege. *Environmental Protection Agency v. Mink*, 410 U.S. 73, 87–89, 93 S.Ct. 827, 836–37, 35 L.Ed.2d 119 (1973). Consequently a document must meet two basic requirements for the privilege to apply: 1) it must be predecisional, i.e., generated before the adoption of an agency's policy or decision, and 2) the document must be deliberative in nature, containing opinions, recommendations, or advice about agency policies. *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 866 (D.C. Cir.1980). Moreover, any factual material that can be reasonably severed from deliberative material is discoverable. *See F.T.C. v. Warner Communications, Inc.*, 742 F.2d 1156, 1161 (9th Cir.1984).

■ Because the ultimate purpose of the deliberative process privilege is to protect the quality of agency decisions, *Sears* 421 U.S. at 151, 95 S.Ct. at 1516–17, insofar as it promotes earnest discussion within governmental walls[13] as well as protects against premature disclosure of proposed agency policies or decisions, the privilege is a qualified one. The Court must engage in an ad hoc balancing of the evidentiary need for the material against the harm to the government that may result from disclosure. Among the factors to be considered in making this determination are: 1) the relevance of the evidence; 2) the availability of other evidence; 3) the government's role in the litigation; and 4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions. *F.T.C. v. Warner Communications, Inc.*, 742 F.2d at 1161 (citing cases).

■ An open question appears to be whether or not the deliberative process privilege protects state legislators. The Third Circuit, which essentially incorporated the *Gillock* holding in a case regarding certain Pennsylvania legislators' vain attempt to immunize themselves against a federal grand jury subpoena, stated in dictum that the federal deliberative process privilege "provides a useful analogy for a confidentiality-based privilege for state legislators...." *In re Grand Jury*, 821 F.2d 946, 958 (3rd Cir.1987). The Court reasoned that since "executive agencies, like state legislators, engage in a wide variety of activities, including factual investigations for quasi-legislative rulemaking," then it made sense to offer state legislators similar protection so long as confidentiality could be protected without unduly inhibiting the truth-finding process of litigation. *Id.* at 958–59. For reasons we will elaborate upon below, we are not convinced by the reasoning of the Third Circuit and hold that the *legislative* aides herein cannot claim protection under the deliberative process privilege essentially because the privilege applies only to executive officials.

### C. The Documents

#### 1. Dr. Juan B. Aponte

■ Dr. Juan B. Aponte, as Special Advisor to the President of the Senate, claims legislative privilege against disclosure of four documents as well as protection against being deposed. The documents are essentially correspondence from Dr. Aponte to the President of the Senate dating from May 1986 to August 1987. Our examination of the documents shows that each one of them can be classified as falling under the "legislative acts" penumbra of the legislative immunity doctrine. *Hutchinson v. Proxmire*, 443 U.S. at 127, 99 S.Ct. at 2684; *United States v. Brewster*, 408 U.S. at 525, 92 S.Ct. at 2544. All the documents involve matters "gener-

---

**13.** *See United States v. Nixon,* 418 U.S. 683, 705, 94 S.Ct. 3090, 3106, 41 L.Ed.2d 1039 (1974) ("Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process.")

ally done in Congress in relation to the business before it." *Brewster,* 408 U.S. at 512, 92 S.Ct. at 2544. Despite this fact, however, there are two basic reasons why these documents are *not* protected against disclosure in this case: (1) the legislative privilege is one of non-evidentiary use against a legislator not one of non-disclosure; and (2) neither the discovery sought by plaintiff nor the nature of this suit entail any direct liability against Dr. Aponte—a concern at the core of the separation-of-powers doctrinal foundation for the legislative privilege.

 We begin by reaffirming the legal rule that in civil prosecutions state legislators, to the same extent as their federal counterparts, are immune from suits for damages, injunctive or declaratory relief based on their activities that fall within the traditional sphere of legislative activity. *See Dennis v. Sparks,* 449 U.S. 24, 30, 101 S.Ct. 183, 187–88, 66 L.Ed.2d 185 (1980); *Star Distributors, Ltd. v. Marino,* 613 F.2d 4, 9 (2nd Cir.1980). The main purpose of this evidentiary privilege, however, is to prohibit evidence of a congressman's acts to be used in a proceeding against him (based on a historical fear that legislators could be subject to "prosecution by an unfriendly executive and conviction by a hostile judiciary.")[14] and not to protect the confidentiality of legislative communications.[15] "The speech or debate privilege is at its core a 'use privilege' not a privilege of nondisclosure." *In re Grand Jury,* 821 F.2d at 958 (citations omitted). This means that documents created by legislative activity can, if not protected by any other privilege, be disclosed and used in a legal dispute that does not directly involve those who wrote the document, i.e., the legislator or his aides. *See, e.g., In re Grand Jury Investigation ("Eilberg"),* 587 F.2d 589, 597 (3rd Cir.1978) (suggesting that doc-

uments memorializing legislative activities may be usable against third parties).

 It does not follow; however, that because Dr. Aponte's documents are discoverable that he himself is automatically subject to a deposition. The reason being that the Speech or Debate Clause provides for testimonial and use immunity.

The Clause states that congressmen "shall not be questioned in any other place" (other than the Congressional floor) and the Supreme Court has interpreted this provision broadly to protect legislators "not only from the consequences of litigation's results but also from the burden of defending themselves." *Dombrowski v. Eastland,* 387 U.S. 82, 85, 87 S.Ct. 1425, 1427, 18 L.Ed.2d 577 (1967). The protection, however, is not limited to courtroom proceedings themselves but to any litigatory activities that create distractions or force legislators to divert their time, energy and attention from their legislative tasks. Or for those that are used to delay or disrupt the legislative function or that bring judicial power to bear in such a way that legislative independence is imperiled. In short, "the Speech or Debate Clause is an absolute bar to interference." *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 503, 95 S.Ct. 1813, 1821, 44 L.Ed.2d 324 (1975); *See also United States v. Helstoski,* 442 U.S. 477, 489–90, 99 S.Ct. 2432, 2440, 61 L.Ed.2d 12 (1979). We read this mandate to include a bar against depositions in civil proceedings regardless of the third-party or "non-party" status of the legislator in question.[16]

In summary, the confidentiality at stake in these documents is not one that should prompt legislative immunity. Since the privilege is one simply of personal use or testimony, then they are not protected by the Speech or Debate Clause and consequently must be disclosed. However, the bar against the taking of the deposition of

---

**14.** *See* pp. 291–293 *supra.*

**15.** *See* notes 8 and 10 and accompanying text *supra. See also* Project, *Developments in the Law–Privileged Communications,* 98 Harv.L. Rev. 1450, 1615 (1985) ("the clause is tailored to provide immunity for legislative activities rath-

er than to maintain strict communicative confidentiality.")

**16.** Again we note that the actual job position of petitioners herein, i.e., aides rather than legislators, does not affect our analysis. *See* p. 292 *supra.*

Dr. Aponte emitted in our prior order stands because Dr. Aponte, given the legitimate legislative activity he was conducting (which is the sole subject of plaintiff's discovery interests), is protected by the Clause from being "questioned in any other place."

■ Although petitioners raise only the Speech or Debate Clause privilege regarding the documents at issue they couch their arguments on notions of confidentiality. We have found one case which in dicta stated that the "deliberative process privilege" for executive officials "provides a useful analogy for a confidentiality-based privilege for state legislators . . .", *see In re Grand Jury*[17] *supra,* but we are not convinced. We are unwilling to hold that a deliberative process privilege protects state legislators. They are part of the governmental branch that historically has been subjected to the greatest degree of public accountability. There are too many potentially detrimental ramifications to applying a confidentiality-based privilege to a governmental body that should continually remain open to the legitimate scrutiny of its constituents. Legislators should be protected from overreaching and intimidation by other branches of government and possibly from abusive or disruptive public intrusion but we refuse to swaddle them in a cocoon of secrecy for acts that go to the core of our democratic processes. Accordingly, Dr. Aponte is to produce to plaintiff all the documents submitted for in-camera inspection, to wit: JBA–1; JBA–2; JBA–3; and JBA–4.[18]

### 2. Mr. Oscar Rodriguez

■ Mr. Oscar Rodriguez, Special Assistant to the Governor of the Commonwealth of Puerto Rico, has submitted fifty-five documents for an *in camera* inspection alleging that they are protected against disclosure primarily by the executive privilege. The documents for the most part are internal memoranda or letters concerning the medical malpractice issue in Puerto Rico. There are also some minutes of closed meetings, transmittal slips and handwritten notes. Five specific documents, i.e., OR.3, OR.8, OR.17, OR.22, and OR.23, are memoranda addressed to congressmen concerning "the medical malpractice insurance situation." (All the documents date from approximately early July of 1985 to early December of 1986. Law No. 4, 26 L.P.R.A. §§ 4101–4107 (Supp. 1987), was enacted on December 30, 1986 with an effective date of March 1, 1987). As to these last, Mr. Rodriguez claims legislative immunity based on the Speech or Debate Clause. He specifically states that these documents "are part of the deliberative process of the executive while functioning in a legislative capacity which is covered by the Speech or Debate Clause of the Constitution of Puerto Rico." (Petitioners' "Motion in Support of Privilege Claims," docket No. 131 at 13). The sole legal support for this contention is a bald citation to *Supreme Court of Virginia v. Consumers Union of the United States,* 446 U.S. 719, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980).

We find the *Supreme Court of Virginia* case, which we briefly discussed above in another section of this Order, to be inapposite to Mr. Rodriguez's position. First, that case involved the judicial and not the executive branch of government. Second, the Supreme Court held in that case that the Virginia Supreme Court, in promulgating the Virginia Code of Professional Responsibility, had acted in a legislative capacity and, in that capacity, the Court and its members were immune from a Section 1983 suit by virtue of the Speech or Debate Clause. Here, no such legislative capacity exists for Mr. Rodriguez nor did he undertake any quasi-legislative role. Rather, he simply wrote some memoranda to members of the Puerto Rico legislature which ex-

---

**17.** Curiously enough, the Third Circuit did not even want to stretch this novel approach to include state legislative documents which somehow reveal the "thought processes" of state legislators.

**18.** Even if we were to apply the deliberative process privilege to these documents, JBA–4 would not be protected because it was not pre-decisional since it was written in 1987 and Law No. 4 was passed in December of 1986.

pressed essentially the Executive's views on proposed legislation on public matters concerning insurance problems. This cannot constitute the type of legislative acts envisioned in *Brewster, supra*. Last, even if we were to determine that legislative immunity is applicable, as we explained above the immunity would cover only the evidentiary use in a proceeding against Mr. Rodriguez and not its disclosure as requested in this case.

We now proceed to analyze whether or not the executive privilege is applicable to any of the documents, or parts thereof, submitted by Mr. Rodriguez.

Following the example set by the Ninth Circuit in *F.T.C. v. Warner Communications, supra*, we begin our inquiry by first looking at whether or not the documents meet the two threshold requirements for the deliberative process to apply (i.e., that they are predecisional and deliberative in nature). Then we will balance plaintiff's need for the information with the Government's interest in nondisclosure only for those documents that meet both of the threshold requirements.

The first requirement has been met easily: all the documents date before December 30, 1986 and are therefore predecisional.

The following documents fail at the second requirement that they be deliberative in nature insofar as they do *not* contain opinions, recommendations or advice about agency policies or they are otherwise purely factual. *Mink*, 410 U.S. at 87–89, 93 S.Ct. at 836–87. Or that their factual content is clearly severable from the deliberative material. *See Binion v. United States Department of Justice*, 695 F.2d 1189 (9th Cir.1983).

The documents or the parts of documents that are facially *not* protected by the executive privilege are:

1. OR–2.15; OR–2.16; and OR–2.17 (Summary of proposed bills and bibliography);

2. OR–11.4 (copy of addressed envelope);

3. OR–13.1 (memorandum informing of staff meeting);

4. OR–14.1 (listing of members of a "task force" meeting and the agenda for that meeting);

5. OR–18.1; OR–18.2 (agenda and listing of invitees for meeting of doctors) NOTE: on OR–18.1, at the bottom, information under heading "Observación" may be deleted before production;

6. OR–21.1; OR–21.2; OR–21.3 (letter of Senator Hernández Agosto to petitioner);

7. OR–23.1; OR–23.2; OR–23.3 (memorandum from petitioner to Senator Rivera Ortiz);

8. OR–27.7 (copy of addressed envelope);

9. OR–31.3 thru OR–31.25, inclusive (statistical data and copies of local and temporary laws of various states);

10. OR–34 thru OR–37, inclusive (transmittal slips);

11. OR–40 (copy of OR–13.1 above);

12. OR–43.1 (memorandum cover sheet);

13. OR–50.1 (transmittal slip); and

14. OR–51.1 thru OR–51.3, inclusive (memorandum advising of meeting, schedule of events)

Those documents not included in this list meet the initial two requirements. As we mentioned above, the deliberative process privilege is a qualified one. A litigant may obtain deliberative materials "if his or her need for the materials and the need for accurate fact-finding override the government's interest in non-disclosure." *F.T.C. v. Warner*, 742 F.2d at 1161 (citations omitted).

Some of the important factors to consider in making the balance are: 1) the relevance of the evidence; 2) the availability of other evidence; 3) the Government's role in the litigation; and 4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions. *Id.*

Although Mr. Rodriguez makes much ado about what he terms the complete irre-

levance of the materials sought and plaintiff's failure to show a special need for these documents, we do not feel the same.

In our September 14, 1988 Omnibus Order we discussed more fully the relevance issue within the context of this litigation and we need not repeat it here. Suffice it to say that these documents are not sought by plaintiffs to show the legislative motive behind Law No. 4, which as Mr. Rodriguez correctly points out is of little consequence in a case dealing with the constitutional attack of a statute.[19] Rather, the discovery of these documents is meant to, *inter alia,* show the alternatives available to the legislature as well as to develop a more complete factual record of what information was available to the legislature regarding the alleged medical malpractice insurance crisis. The information sought is relevant at the very least to support plaintiff's substantive due process claim (whether the claim itself will survive further scrutiny is not an issue before us at this time), i.e., whether there was a rational relationship between Law No. 4 and the perceived insurance crisis. If more reasonable alternatives existed and these were considered and arbitrarily discarded by the legislature, this may be added fodder to plaintiff's attack against the statute. Admittedly, this is not steady ground but it is sufficiently level to overcome Mr. Rodriguez's present argument. As to the showing of a special need; this is intertwined with plaintiff's ability to obtain the information by other means. It seems largely undisputed that plaintiff cannot obtain this information in any other way. Nor has Mr. Rodriguez convincingly rebutted plaintiff's argument that it would be forced to prosecute this claim "in the dark" or at a serious and unfair disadvantage without this information.

As to the third factor—the Government's role in this litigation—it is extremely limited regarding Mr. Rodriguez. Of course, the defendant, Juan Antonio García, is a government official and this suit involves a

constitutional challenge to a local statute. However, the question of the Government's role must be viewed only vis-á-vis the documents at issue and not on the basis of whether some other unrelated entity of the Government is a party defendant in the main suit. Here, Mr. Rodriguez's role is limited to a non-party subpoena duces tecum. The Government itself is only indirectly involved in this particular issue insofar as it is Mr. Rodriguez's employer.

Finally, we reach the last factor. This one has the greatest impact on the traditional confidentiality-based rationale for the executive privilege: Would revelation of the remaining documents serve to chill "frank discussion and deliberation in the future among those responsible for making governmental decisions"? *Id.* at 1162. Regarding some of the documents, particularly handwritten observations and memoranda imbued with such open-faced sincerity typically triggered by the assumption in the mind of their author that such discourse is nothing more than protected confidences, the answer seems to be an overwhelming "yes." Other documents, however, emit the cold feeling of grist for the bureaucratic mill that smacks more of process than it does of substance. As to these, which we enumerate immediately following, we find that plaintiff's need for this information and the need of our truth-finding process overrides the Government's interest in nondisclosure. Accordingly, the following documents are *not* protected by the executive privilege:

1. The four documents discussed above for which Mr. Rodriguez only claimed the legislative privilege but which we have nonetheless evaluated under the executive privilege and found them lacking merit for such protection;

2. OR–2.1 thru OR–2.14, inclusive (draft of "task force");

3. OR–4.1 thru OR–4.3, inclusive (short term measures);

---

**19.** *See, e.g., U.S. Railroad Retirement Board v. Fritz,* 449 U.S. 166, 175, 179, 101 S.Ct. 453, 459, 461–62, 66 L.Ed.2d 368 (1980); *United States v. O'Brien,* 391 U.S. 367, 383, 385, 88 S.Ct. 1673, 1682–83, 20 L.Ed.2d 672 (1968). We make no determination on the merits of this matter at this time.

4. OR–10.1 thru OR–10.3, inclusive (memorandum from Juan Agosto Alicea);

5. OR–11.1 thru OR–11.3, inclusive (letter from Secretary of State Official);

6. OR–16.1 thru OR–16.9, inclusive (letter from the Secretary of Health);

7. OR–20.1 thru OR–20.6;

8. OR–24.1; and OR–24.2 (letter from Commissioner);

9. OR–25.1 thru OR–25.28 (memorandum from outside consultants);

10. OR–26.1 thru OR–26.6, inclusive;

11. OR–27.1 thru OR–27.6, inclusive (letter from the Commissioner);

12. OR–28.1 and OR–28.2 (letter from Secretary of Health);

13. OR–29.1 and OR–29.2 (letter from President of Government Development Bank);

14. OR–30.1 thru OR–30.5, inclusive (letter from J. Robert Hunter);

15. OR–31.1 and OR–31.2 inclusive (memorandum from J. Robert Hunter);

16. OR–32.1 (internal memorandum);

17. OR–39 (internal memorandum);

18. OR–41.1 and OR–41.2 (internal memorandum);

19. OR–42.1, OR–42.2 and OR–42.3 (internal memorandum);

20. OR–44.1 and OR–44.2 (letter from Mr. Rodriguez);

21. OR–47.1 and OR–47.2;

22. OR–48.1 and OR–48.2 (memorandum);

23. OR–52.1 thru OR–52.6, inclusive (memorandum);

24. OR–53.1 thru OR–53.3, inclusive (memorandum);

25. OR–55.1 thru OR–55.2, inclusive (memorandum);

We find that the balance of interests favors that the following documents be protected by the executive privilege. Their disclosure would not only injure the quality of agency decisions, but, more importantly, we feel that the truthfinding task of this Court or the need of plaintiff does not outweigh the Government's interest in maintaining the confidentiality of these materials.

The documents *protected* by the executive privilege are:

1. OR–1.1 thru OR–1.7, inclusive

2. OR–5.1 thru OR–5.3, inclusive

3. OR–6.1 thru OR–6.6, inclusive

4. OR–7.1 thru OR–7.4, inclusive

5. OR–9.1 thru OR–9.11, inclusive

6. OR–12.1 thru OR–12.3, inclusive

7. OR–14.3 thru OR–14.7, inclusive

8. OR–15.1 thru OR–15.5, inclusive

9. OR–33.1 thru OR–33.5, inclusive

10. OR–38

11. OR–45.1 thru OR–45.3, inclusive

12. OR–54.1 thru OR–54.2, inclusive

## CONCLUSIONS

Petitioners are to produce the documents, or parts thereof, not protected by this Order on or before **May 15, 1989.** The deposition of Mr. Rodriguez can be taken exclusively as to the *un*protected information. Dr. Aponte will not be deposed. Accordingly, petitioners' "Motion in Support of Privilege Claims," filed September 30, 1988 (docket No. 131) is hereby denied in part and granted in part. Consequently, plaintiff's "Motion to Compel the Attendance of Deponents Aponte, Platón and Rodriguez and to Compel Production of Documents, filed August 23, 1988 (docket No. 102) is hereby granted in part and denied in part as detailed in the above discussion. Any provisions of our September 14, 1988 Omnibus Order (docket No. 122) inconsistent with this Order are hereby vacated. Finally, the information obtained by plaintiff by virtue of this Order shall be subject to the "Confidentiality Order" that rules this litigation. *See*, docket No. 97, filed August 15, 1988, Addendum A.

IT IS SO ORDERED.